

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 95 C 6340 | **DATE** | 9/19/2000 |
| **CASE TITLE** | DONNA BALACHOWSKI vs. PAUL BOIDY,et al | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: we overrule the parties' objections and adopt Magistrate Judge Nolan's Report and Recommendation. Balachowski is awarded compensatory damages in the amount of $22,250.00 and punitive damages in the amount of $5,000.00. Boidy to establish a fund in the amount of $20,990.00 for future retrofitting of Balachowski's unit and certain of the public and common use areas. This is a final and appealable order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | **Document Number** |
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | SEP 2 0 2000 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |

ED-7
FILED FOR DOCKETING
00 SEP 19 PM 4: 49

| TBK | courtroom deputy's initials |
|---|---|

date mailed notice

Date/time received in central Clerk's Office

mailing deputy initials

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| DONNA BALACHOWSKI | ) ) ) ) ) | |
| Plaintiff, | ) ) ) | No. 95 C 6340 Judge Ronald A. Guzman |
| PAUL BOIDY LOUIS J. GARAPOLO & ASSOCIATES | ) ) ) ) ) | **DOCKETED** **SEP 2 0 2000** |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Donna Balachowski filed the instant lawsuit alleging that Defendant Paul Boidy

violated the Fair Housing Act ("the Act"), 42 U.S.C. § 3601 et seq., by failing to make

reasonable accommodations, failing to allow reasonable modifications, and failing to design and

construct the building located at 1106 First Avenue in Maywood, Illinois in accordance with the

requirements of the Fair Housing Act. Liability is not an issue here. Judge Leinenweber entered

an order of default as to Boidy on May 8, 1996. On August 16, 1996, Judge Leinenweber

granted Balachowski's motion for a permanent injunction. On December 11, 1997, Boidy moved

to vacate the order of default. On January 16, 1998, Boidy filed an amended motion to vacate

portions of the default order. On August 19, 1998 these motions were denied. The matter was

99

then referred to Magistrate Nolan for a prove-up hearing on damages. A three-day hearing was held.

After considering the testimony of the witnesses, the documents admitted into evidence, and the parties' proposed findings of fact and conclusion of law Magistrate Judge Nolan submitted a comprehensive Report and Recommendation which set forth the court's findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a). Magistrate Judge Nolan recommended that Balachowski be awarded compensatory damages in the amount of $25,250.00 and punitive damages in the amount of $5,000.00 Magistrate Judge Nolan further recommended that Boidy establish a fund in the amount of $20,990 for future retrofitting of Balachowski's unit and certain of the public and common use areas.

## BACKGROUND FACTS

Plaintiff Donna Balachowski suffers from numerous impairments including osteoarthritis, nerve damage, degenerative joint disease of the back, and environmental depression. Uncontested fact ¶ 2; Tr. 39-43; 155. Balachowski primarily uses a wheelchair for mobility. Tr. 112-114; 124-128. Balachowski is handicapped within the meaning of 42 U.S.C. §3602(h). Uncontested fact ¶ 1. Balachowski resides at 1106 First Avenue, apartment #100, in Maywood, Illinois (the "Building") and had lived there continuously since August 2, 1992. Uncontested fact ¶ 3. Apartment 100 is located on the ground floor of the Building. Tr. 61.

Defendant Paul Boidy is a builder, contractor, owner, and developer who does business under the name of Cassiday Builders. Uncontested Fact ¶ 4. Boidy has been building in Maywood for 18 years. Tr. 344. Boidy has a college degree and completed two years of law school at John Marshall Law School. Tr. 263. Boidy resides in Glencoe, Illinois. Tr. 232.

## The Building

Boidy constructed the Building. Uncontested Fact ¶ 5. The Building is a two story, 14 unit multi-family dwelling. Uncontested fact ¶ 6. Boidy lost ownership of the Building in late 1997. Tr. 259. Boidy employed Garapolo & Associates of Oak Park, Illinois to draw plans for the Building. Tr 234,235. Boidy obtained a building permit from the Village of Maywood and received building approval from various village departments. Tr. 235-239. Neither the architect nor the Village of Maywood raised the issue of handicap accessibility with Boidy during the construction process, other than mentioning handicap accessible doorknobs. Tr. 239-240. The Village of Maywood issued an occupancy permit for the Building. Tr. 240. On March 20, 1992, the Village of Maywood approved Boidy's Application for a Certificate of Final Inspection and Occupancy concerning the Building. Uncontested Fact ¶ 7. On May 11, 1992, the Village of Maywood issued a certificate that no building code violations existed on the property where the Building is located. Uncontested Fact ¶ 8.

David Robb prepared two reports and testified at the hearing concerning the building's violations of the Act's accessibility requirements and his recommendations for barrier removal. Tr. 359-395; Plaintiff's Exs. 22,23. Robb has a B.S. in industry technology and a master's degree in rehabilitation counseling. Tr. 360. Robb's past experience includes project director for a housing development organization for eight months and technical assistance coordinator for the Progress Center for Independent Living for five and a half years. Tr. 361. At the time of the hearing, Robb had been the compliance manager for the Chicago Housing Authority ("CHA") for four months. Tr. 361. As compliance manager, Robb Manages the CHA's compliance with the Americans with Disabilities Act and Section 504 of the Rehabilitation Act. Tr.362. Robb

3

testified that Balachiwski's unit and certain public and common use areas in the Building are not readily accessible to and usable by persons in wheelchair. The following conditions at the Building do not comply with the Act's accessibility requirements:

1. rear entrance platform does not meet minimum dimension of 5 feet by 5 feet;

2. rear entrance platform does not contain edge protection at least 2 inches in height;

3. rear entrance ramp does not meet minimum 36 inches wide requirement or maximum slope requirement of 1:12;

4. rear entrance ramp does not have edges 2 inches in height;

5. rear entrance door has a round doorknob;

6. rear entrance door exceeds the maximum 8.5 pounds of force allowable;

7. security intercom system is only available at front entrance which was originally inaccessible because it had a step instead of a ramp;

8. laundry room is inaccessible to wheelchair user because room is not wide enough to allow clearance for wheelchair user to enter and maneuver wheelchair within laundry room;

9. hallway leading to the elevator on the first and second floor does not meet minimum width of 48 inches;

10. storage room inaccessible to wheelchair user because hallway on second fllor leading to storage room is too narrow;

11. Balachowski's unit does not have the necessary wheelchair maneuvering space immediately inside the entrance;

12. door to Balachowski's unit exceeds the maximum five pounds of force allowable;

13. electrical outlets in the kitchen, living rom, and bedroom and telephone jack in living room are lower than the minimum height of 15 inches;

14. light switch and telephone jack in the kitchen, intercom in living room, and light switch in bedroom and bathroom are higher than maximum height of 48 inches;

15.     thermostat control is not at an accessible height;

16.     control to operate wall mounted air conditioner are higher than maximum height of 48 inches;

17.     bathroom is inaccessible to wheelchair because necessary door space to maneuver a wheelchair through the door opening is lacking;

18.     walls around toilet and bathtub lake reinforcement necessary for installation of grab bars.

Tr. 369-390; Plaintiff's Ex.22.

Balachowski first viewed apartment #100 in July 1992.  Before moving in to the Building, Balachowski knew the front entrance had a step and the size of the bathroom in apartment #100 might be a problem for her when in her wheelchair.  Tr. 172-173.  When Balachowski first inspected the apartment, she entered the Building through the rear entrance in her wheelchair.  Tr. 173.  In the course of inspecting the apartment, Balachowski moved around the apartment in her wheelchair.  Tr. 173.  Beginning in June 1993 and at various times thereafter, Balachowski gave Biody copies of the Illinois Accessibility Code, the Fair Housing Accessibility guidelines, and the Illinois Accessibility Code Site Inspection Checklist.  Tr. 46-48; Plaintiff's Exs. 448-50.  Balachowski testified as to the accessibility problems she has experienced in her apartment and the Building and how these barriers affected her .  Tr. 49-109; 145-148.

**Front Entrance**

When Balachowski  moved into the Building, the front entrance had a single step and was inaccessible to her when in her wheelchair.  Tr. 53, 54; Plaintiff's Exs. 40A-D.  Boidy installed a ramp at the front entrance sometime in 1995 or 1996.  Tr. 90; Plaintiff's Exs. 36 A-F.  The ramp

at the front entrance is not the proper grade and is directed toward First Avenue which is four-lane road with a speed limit of 35 m.p.h. Tr. 91;212. The front entrance ramp fails to contain anti roll-off devices. Tr. 92; Plaintiff's Exs. A-F. On one occasion, Balachowski used her electric wheelchair to proceed down the front entrance ramp and ended up on her back and stuck in her wheelchair. Tr 91. Paramedics assisted Balachowski in getting out of her wheelchair and she spent time in the emergency room. Tr. 91.

## Rear Entrance

On one occasion when not in her wheelchair, Balachowski fell off the rear entrance ramp while attempting to open the rear from the outside. Tr. 49, 50-51. Balachowski bumped her hand slightly and went to the emergency room. Tr. 51. On numerous occasions, Balachowski has fallen off the rear ramp while in her wheelchair when persons have the door from inside. Tr. 50. The ramp fails to contain an anti roll-off device, and the window in the backdoor is too high for a person leaving the building to see a person in a wheelchair on the other side of the door. Tr. 50. Balachowski experiences difficulties opening door because it has a round doorknob. Tr. 52. Balachowski also finds the rear door extremely heavy. Tr. 52. Balachowski described the process of going up the rear ramp and getting through the rear door as "quite exhausting." Tr. 52. The hallway leading to her rear door originally contained a sewer hole with a drainage cap which was smaller than th4e opening. Tr. 55. The cap would catch the front wheel of Balachowski's wheelchair and back wheel of her electric scooter which often caused her to drop what she was carrying. Tr. 55-56. Balachowski felt agitated and frustrated every time her chair caught in the sewer hole. Tr. 56. According to Balachowski, when she travels over a bump in her manual or electric chairs, she experiences shooting pain that literally goes up

6

[her] back into [her] neck and into [her] head that is a paralyzing type of pain." Tr. 56. The drainage cap was repaired sometime between1995 and 1996. Tr. 57-58. Approximately a year before the ramp at the front entrance was installed a new ramp at the rear entrance of the Building was installed. Tr. 92.; Plaintiff's Exs. A-G. The new ramp at the rear entrance fails to contain an anti roll-off device. Tr. 92. Balachowski felt the new ramp was just as difficult to deal with as the prior ramp. Tr. 92. Balachowski experienced frustration and aggravation when Boidy installed a new ramp which continued to violate the requirements of the Act. Tr. 92-93. In April 1994, Robb informed Boidy that the ramp at the rear entrance could be made wheelchair accessible without much cost or effort. Tr. 364. Robb drew Boidy a sketch of a compliant ramp. Tr. 364. Robb testified that Boidy's response was as follows: "As I recall, he said that the ramp he had put in , that he had done it out of the goodness of his heart and that he had no intentions of changing it." Tr. 364-365. Alberta Johnson, Balachowski's friend, has observed Balachowski's difficulties dealing with the rear door when in her chair: "It's hard to reach over the front of the basket to reach the door and turn the key pull on the door and back up and take out the key and pull forward and keep the door from slamming shut in your face." Tr. 218-19. Johnson also uses a wheelchair for mobility. Johnson uses the rear entrance of the Building to access Balachowski's apartment. Tr. 213. Since the rear entrance does not have a buzzer and intercom system, Johnson waits for a resident to open the door if one happens to be entering or exiting the Building or knocks on Balachowski's window and waits for Balachowski to meet her at the rear door. Tr. 213, 214. Johnson finds the rear ramp moderately difficult to use and the rear entrance difficult but not impossible to use. Tr. 214-215.

## Balachowski's Apartment Door

The door to Balachowski's apartment is not wide enough for her to easily maneuver through in her wheelchair. Tr. 58. When in her manual chair, Balachowski has to use her left leg to maneuver her chair through the door which aggravates her back. Tr. 59. Balachowski also hits the wall and scratches her knuckles or elbows on the wall when trying to manuever her wheelchair in to the apartment. Tr. 59. For an unspecified period of time while Boidy owned the Building, the intercom system on the front entrance door was broken. Tr. 60. Residents had to meet visitors at the front door. Tr. 60. Meeting visitors at the front door was difficult for Balachowski and others with mobility problems. Tr. 60. Balachowski made Boidy aware of the broken intercom system. Tr. 66. Between 1994 and August 1998, the security lock on the front door was also broken. Tr. 61-63. The peephole in Balachowski's apartment door is too high for her to use while in a wheelchair. Tr. 62. With the lock on the front broken and her inability to use her peephole, Balachowski never knew if a knock at her door was a friend, neighbor, or person off the street. Tr. 20. Around the time she moved inti the Building, Balachowski gave birth to a child she conceived as a result of being raped. Tr. 64. Having experienced a rape, Balachowski had a heightened concern about her safety and security. Tr. 62, 64, 65.

On October 3, 1995, one of the other residents of the Building damaged Balachowski's apartment door. Tr. 65,66; Plaintiff's Ex. 21. Thereafter, Balachowski had to lift the damaged door to close it which was difficult given the condition of her hands. Tr. 66. Balachowski informed Boidy of the problem with her apartment door the night after it was damaged. Tr. 65-66. Boidy never repaired the apartment door. Tr. 66.

8

**Apartment Doorknob**

For approximately a month and a half, Balachowski's apartment door lacked a doorknob Tr. 145-146. Balachowski made a homemade doorknob out of a pair of socks. Plaintiff's Exs. 39A-B. Boidy had notice of the missing doorknob. Tr. 145-146. The lack of a doorknob made Balachowski feel "extremely unsafe." Tr. 146. She feared that someone could remove the sock and use a wire or coat hanger to undo the dead bolt from the inside. Tr.146. On March 12, 1997, Balachowski requested in writing a level door knob for her apartment door. Plaintiff's Ex. 20. Boidy eventually installed a level doorknob on her apartment door. Tr. 148; 223-224.

**Kitchen**

With Boidy's permission, Balachowski and three friends reversed the doors on her refrigerator and freezer to make them easier for her to access while in her wheelchair. Tr. 67. The burners on the stove are difficult to use while sitting in her wheelchair. Tr. 68-69. Balachowski has a homemaker who helps her three times a week with cooking and other household chores. Tr. 69. Balchowski is unable to assist her homemaker with cooking because of the overuse symptoms in her upper extremities. Tr. 70. The electrical outlets in Balachowski's kitchen are too low for her to use. Tr. 71. Between the fall of 1993 and spring of 1994, Balachiwski purchased six surge protectors which she put at a higher level than the outlets. Tr. 71-73. The surge protectors solved Blalchowski's inability to use her outlets. Balachowski felt "upset" and "rage" when she was unable to use her electrical outlets. Tr. 72.

Balachowski explained the difficulties she encountered trying to use the inaccessible outlets: "To bend down from a standing position, it- I get stuck literally and I can't do it. Therefore, if I do it in the wheelchair, since - when you lean forward too far, you literally can do

a somersault and end up flipping yourself out of the wheelchair or having the wheelchair on top and you underneath it. The first time I tried it, I said 'forget it.' And I went out and got surge - surge protectors. And once those were in then, I just put those at a higher ability to plug things in and out in the kitchen." Tr. 71. When Balachiwski asked Boidy for assistance regarding the outlets, he responded: "Go ahead and go get some. I am not going to stop you. Go ahead and go get them." Tr. 72.

**Bathroom**

The width of the bathroom door prevents Balachowski from getting her wheelchair in the bathroom and closing the door. Tr. 73. Balachowski would try not to use her toilet when she had visitors because of the lack of privacy. Tr. 74. If necessary, Balachowski would ask visitors to step into the hallway outside her apartment or in her bedroom when she used the toilet. Tr. 75. Balachowski described the experience of not being able to use her bathroom with privacy when guests were present as "quite embarrassing" and "dehumanizing." Tr. 75. Balachowski eventually installed a curtain rod and shower curtain in the location of the bathroom door in order to maintain some privacy. Tr. 76. After Boidy lost ownership of the Building, the receivers allowed Balachowski to take the bathroom door down. Tr. 77. Balachowski made Boidy aware of the problem with her bathroom door and nothing was done to address the problem. Tr. 77. The grab bar in Balachowski's shower is loose and she fears that it will not hold when she needed it. Tr. 78. Balachowski asked Boidy to fix the grab bar and he failed to fix it. Tr. 79. Balachowski described her experience using the bathtub: " I would have to hold on to sink and face the tub. And it just - it's a constant fear because the bathtub is where most serious injuries would end up occurring. " Tr. 78. Balachowski also explained how the inaccessible bathroom

10

made it difficult for her to wash up after suffering from incontinence: "And there were times I had to take what I call half showers because I would end up urinating on myself. And I would have to wash my feet. It's aggravating alone to urinate on yourself and not have control of your bladder, but it's compounded by the fact that you can't wash up properly either." Balachowski further testified to the inaccessibility of the grab bar to the toilet. Tr. 76. She used the sink for support instead of the grab bar and pulled the sink off the wall. Tr. 76. Balachowski often relies on her homemaker to assist her with showering and washing her hair. Tr.79. Johnson described the difficulties Balachowski experienced when using her bathroom: " If the door was still open, you could see the pain on her face if you didn't hear her, whatever, (making sounds). These sounds are just sounds that you make when you're - when you can't hold in the pain and you got to let some of it out but you don't want to embarrass anybody around you. And this is - you know, I could tell she is having difficulty because I could hear her and I see she is in pain." Tr. 220.

## Environmental Controls

The thermostat in Balachowski's apartment is not at an accessible height. Plaintiff's Ex. 22. The air conditioning unit in her apartment is six inches from the ceiling and she cannot reach the controls while sitting in her wheelchair. Tr. 81-82. Balachowski asks friends or her homemaker to regulate the air conditioner for her. Tr. 82-83.

## Laundry Room and Hallways in the Building

The washer and dryer are located on the second floor of the apartment building. Tr. 83. Balachowski is unable to get her wheelchair into the laundry room. Tr. 83-84. It is also difficult for Balachowski to maneuver her wheelchair through the first floor and second floor hallways

because they are too narrow. Tr. 84-85. The doorknob on the laundry room door is round. Tr. 85. Balachowski's homemaker assists her with her laundry. Tr. 86. Boidy rearranged the washer and dryer within the laundry room in an unsuccessful attempt to make the machines more accessible. Tr. 88. Balachowski explained the difficulties she has maneuvering her wheelchair through the first floor hallway: "[W]hen you're using a manual chair, you - your elbows kind of stick out and your knuckles are right there and they would get scraped and bruised and bumped." Tr. 84. When describing the second floor hallway, Balachowski stated: "[M]y entire arm has actually gotten caught behind the wheel and the wall to where I was kind of stuck and had to really undo my arm because it just - I was trying to get down the hallway and it didn't work." Tr. 85. Balachowski is allergic to pine. Tr. 95. Depending on the strength of the pine, Balachowski might experience an asthma attack. Tr. 95. Balachowski asked Boidy to stop using pine oil cleaner to clean the hallways of the Building. Tr. 95. Boidy continued to use pine cleaners. Tr. 95-96.

### Storage Area

Balachowski is unable to get her wheelchair into the storage room on the second floor. Tr. 87-88.

### Elevator

The elevator is in compliance with the Act. Tr. 30. However, Balachowski's manual wheelchair with her left leg piece will not fit on the elevator. Tr. 93. Balachowski often found standing, moldy water in the elevator. Tr. 93. Balachowski is allergic to mold. Tr.93. Given the mold in the elevator, Balachowski was unable to use the elevator to visit residents on the second floor. Tr. 93,94. On several occasions, Boidy attempted to pump the water out of the

elevator. Tr. 94.

## Utilities

For approximately ten days in April 1994, the water in the Building was off. Tr. 96-97.

Balachowski informed Boidy that the water was off in the Building. Tr. 99. Balachowski was

unable to shower, flush the toilet, cook, and wash dishes when the water was shut off. Tr. 97,98.

Balachowski suffers from incontinence which presented a particularly uncomfortable situation

for her when she could not shower. Tr. 97. Balachowski canceled doctor's appointment during

that time period because she "didn't want to go smelling like [she] did without being able to take

a shower." Tr. 97. The gas was turned off once in the Building during one summer and it

affected Balachowski's ability to use her stove. Tr. 98. The electricity has gone out several

times. Tr. 98. On another occasion, smoke was present in the common areas of the Building and

no smoke alarm sounded. Tr. 98-99.

## Parking

The Building has limited parking space. Tr.100. Boidy instituted a parking permit

system. Tr. 100-101. Boidy provided Balachowski with a parking permit for her homemaker.

Tr. 101.

## Snow and Ice Removal

The parties presented conflicting testimony concerning snow and ice removal around the

building. Balachowski claimed that Boidy plowed the snow around the building only twice

during the time he owned the building. Tr. 108. Johnson testified that she never observed the

snow plowed or shoveled around the Building. Tr. 216. At the hearing, Balachowski presented

photographs depicting snow and ice around the Building at unspecified times during the winters

of 1995-1996 and 1996-1997. Tr. 101-107; Plaintiff's Exs. 27A-J; 28A-F;31A-B; 38A-H; 41A-L. Balachowski testified that during the winter months, she experienced problems entering and exiting the Building in her wheelchair because of the lack of snow and ice removal. Tr.101-103. Balachowski's electric scooter can not travel over snow and ice. Tr. 102-103. when Balachowski was unable to leave the Building because of the lack of snow removal, she felt as if she was a prisoner in her apartment. Tr. 109. On one occasion, a driver picking Balachowski up for a doctor's appointment slipped on the ice outside of the Building and injured his back. Tr. 108; Tr.199-205. Balachowski's testimony regarding the frequency of snow removal was contradicted by the testimony of James Kelly. Kelly has worked for Boidy for the last seven years. Tr. 117. Kelly testified that he removed snow at the building and other properties owned by Boidy almost every time it snowed. Tr. 111,119-124.

## Balachowski's Out-of-Pocket Expenses

Balachowski made certain changes to the apartment and purchased certain items to make it more accessible including reversing the refrigerator and freezer doors, installing a hand held shower, purchasing power strips, taking down the bathroom door, and purchasing reachers for the light switches and the thermostat. Tr. 179-183. Balachowski spent a total of $250 making her apartment more accessible. Tr. 183-184.

## Boidy's Promises and Financial Condition

On August 16, 1996, Boidy represented to Judge Leinenweber in open court that he would make the changes recommended by Robb in his first report within 30 days. Tr. 265-268; Plaintiff's Ex. 22. Biody failed to made all of the corrections he promised. Tr. 268. Boidy tried to follow through on the least expensive modifications such as installing a ramp at the front

entrance, installing a new ramp at the rear entrance, rearranging the washer and dryer in the laundry room, and purchasing electrical plugs for Balachowski's outlets that could be placed at a higher level. Tr. 251. When installing the ramps at the front and rear entrances, Boidy did not follow the American National Standard for buildings and facilities providing accessability and usability for physically handicapped people. Tr. 287;388. The front entrance ramp does not have edge protection and is dangerous because it slopes directly into the street. Tr. 388. The new entrance is also unsafe because it lacks edge protection and does not provide enough surface area adjacent to the pull side of the door to allow someone to safety maneuver around the door once it is open. Tr. 389. Boidy admitted receiving the Robb reports which explained the changes necessary to make the Building and Balachowski's apartment accessible. Tr. 282, 340; Plaintiff's Exs. 22,23. Robb was available to consult with Boidy to ensure that any repairs to the Building were made in compliance with the Act. Plaintiff's Exs. 10,11,13. Boidy never contacted Robb. Tr. 341. Boidy testified that at the time he agreed to make certain modifications to the Building before Judge Linenweber in August 1996, he was experiencing :difficult financial problems." Tr.247-248;252;292. Boidy did not tell Judge Linenweber that he was financially unable to follow through on his promises. Tr. 296.

Boidy's financial difficulties resulted in an inability to keep up with the mortgage payments on his buildings and his home, the water being turned off at the Building, and the electricity and gas being turned off at his home. Tr. 248. Certain of the buildings owned by Biody and his home eventually went into foreclosure. Tr. 249. On March 18, 1997, First Bank filed a foreclosure on the Building along with the nine additional buildings belonging to Boidy, Uncontested Fact ¶ 11. On April 4, 1997, a receiver was appointed for all of the First Bank

properties, including the Building. Uncontested Fact ¶ 12. On August 6,1997, Biody filed for protection under Chapter 11 of the Bankruptcy Code. Uncontested Fact ¶ 13. Boidy lost the following buildings as well as his home through foreclosure: 1106 South First, 824 South Thirteenth, 1619 South Fifth, 1713 and 1715 South Third, and 1022 Orchard. Tr. 249. Biody's bankruptcy case was dismissed on December 17, 1997. Uncontested Fact ¶ 14. As part of the settlement, Boidy turned over the Building and twelve other properties to First Bank. Uncontested Fact ¶ 14. In addition, First Bank initially agreed take over 2101 and 2103 South Fourth and 2102 South Fourteenth in order to settle a debt of Boidy's in the amount of $135,000. Tr. 250. At the time Boidy constructed the Building, he owned 18 to 29 properties. Tr. 350. Boidy now owns six properties. Tr. 350. Of the properties Boidy continues to own, 2101 and 2103 South Fourth are three months behind on the mortgages, the taxes have been purchased by tax-buying companies, and another two-flat is going to be deeded to a tax buyer. Tr. 250;350-351. During a settlement conference with Judge Keys on November 1996, Boidy promised to hire a licensed contractor to bring the apartment into compliance with the Act. Plaintiff's Exs. 47. Plaintiff's Ex. 47. Boidy also promised to pay special attention to promptly removing snow around the Building. Plaintiff's Ex. 47. Boidy did not hire a licensed contractor as he had agreed. Tr. 271. None of the promises Boidy made in the settlement conference with Judge Keys were fulfilled. Tr. 151. Biodys failure to follow through on the promises he made before Judge Keys made Balachowski feel "agitated, depressed, piece of garbage, not even human anymore." Tr. 151.

## Alternative Housing

Balachowski applied for Section 8 housing and looked for alternative housing. Tr. 152;

188. Johnson viewed at least five to six alternative apartments with Balachowski over a period of several years. Tr. 223. During 1996 or 1997, the Maywood Housing Authority made Section 8 housing available to Balachowski at less rent than she was paying at the Building. Tr. 186; 197 One of the Section 8 apartments offered Balachowski was handicap accessible. Tr. 189. Balachowski testified that she could not afford the Section 8 apartment because she thought she would be responsible for all utility costs in addition to her portion of the rent. Tr. 186-189. Balachowski incorrectly believed that her rent costs under Section 8 would be limited to 30% of her gross income but that she would also be responsible for all utility costs. Tr. 422-423. Balachowski's own witness, Delores Irvin, established that the maximum a Section 8 tenant would pay total housing costs is 30% of her gross income. Tr. 414. The amount paid by the tenant could include rent or rent and utilities depending on the situation set up by the landlord. tr. 413-414. The John Marshall Law School Fair Housing Legal Clinic was representing Balachowski at the time she was offered accessible Section8 housing. Tr. 423. Any misunderstanding concerning the Section 8 program could have been addressed by her counsel at the Fair Housing Legal clinic. The Court rejects Balachowski's claim that she was not offered affordable and accessible alterative housing. Despite the accessibility problems, Balachowski stayed in her apartment in part because Boidy agreed on August 16, 1996 before Judge Leinenweber and on November 1, 1996 before Judge Keys to make improvements to bring the Building into compliance with the Housing Act. Tr. 151; Plaintiff's Exs.47,63.

**Retrofitting**

Balachowski's unit, the rear entrance, and the public and common use areas of the Building can be retrofitted to bring them into compliance with the Fair Housing Act. Tr. 19-36;

Plaintiff's Exs. 56. The cost associated with bringing the hallways leading to the elevator into compliance with the Act would exceed the replacement cost of the building. Tr. 30,35. Balachowski failed to provide any evidence of the estimated cost of widening the laundry room or making the storage room accessible. Tr. 29-30; Plaintiff's Ex. 56. The Estimated costs of bringing Balachowski's unit, the rear entrance, and the other public and common use areas into compliance with the Act are as follows:

### Public and Common Use Areas

| | |
|---|---|
| Extend/re-build exterior platform at rear door | $1,800 |
| Replace Existing rear door ramp | $2,700 |
| Install accessible door hardware | $250 |
| Adjust opening force of door | $480 |
| Relocate intercom at front door | $600 |
| Install intercom at rear door | $5,680 |
| **Total** | **$11,510** |

### Balachowski's Apartment

| | |
|---|---|
| Reverse swing of entry door | $350 |
| Replace door closer | $420 |
| Raise Outlets | $600 per outlet (3 outlets) |
| Lower light switches | $260 per switch (2 light switches) |
| Lower telephone jack | $180 |
| Install new window AC unit or relocate controls of existing unit | $1300 |
| Provide and install offset hinges on bathroom door | $290 |
| Reverse swing of bathroom door | $200 |
| Remove vanity below sink | $1,670 |
| Install reinforcement at toilet | $550 |
| Install reinforcement at bathtub | $2,200 |
| **Total** | **$9,480** |

Tr. 18-36; Plaintiff Ex. 56.

**Intangible Damages**

To support request for intangible damages, Balachowski relies on her testimony and the testimony of Alberta Johnson. Balachowski began seeing a therapist at Proviso Township Family Services in 1993 for depression. tr. 160-161. Balachowski had been diagnosed with environmental depression. Tr. 192; Uncontested Fact ¶ 2. Balachowski saw a therapist once a week from 1993 through sometime in 1994. Tr. 161. Balachowski then saw a different therapist once a week for the next year to year and a half. Tr. 161. Balachowski also testified that she saw a psychiatrist once a month, but the record is unclear concerning the time period when she saw the psychiatrist. Tr. 160-162. Balachowski gave conflicting testimony concerning whether she has taken any medication for her depression. Balachowski and Johnson met in 1993 or 1994. Tr. 209. Johnson suffers from arthritis, multiple sclerosis, high blood pressure, and heart disease. Tr. 208. Johnson uses an electric scooter for mobility. Tr. 208. Johnson has spent time visiting at Balachowski's apartment and tries to visit Balachowski at least once a week during the winter months. tr. 210;215. Johnson observed some of the difficulties Balachowski had accessing the front entrance, the rear entrance, using the bathroom and kitchen in her apartment, and maneuvering around her apartment in her wheelchair. Tr. 217-221.

Johnson described Balachowski's emotional state when she met her as follows: "Most of the time good, once in a while rocky. But we all are like that, whether we are in a wheelchair or whether we're - what we call an AB or able-bodied person." Tr. 225. Johnson observed Balachowski cry at times because of the difficulties Balachowski encountered in the Building. Tr. 225. Johnson stated the following regarding how the accessibility difficulties affected Balachowski: "[T]hey were her - they wear her out a lot more than they used to. Her physical

tolerance of them isn't as much as it used to be. That with any other things emotional can really be rocky for her." Tr. 225. Johnson indicated that she believed Balachowski might injure herself during the summer of 1998. Tr. 225-226. The evidence in the record does not sufficiently establish that Balachowski's emotional state during the summer of 1998 was caused by the accessibility difficulties in the Building. Rather, Johnson testified that during this period of time, Balachowski was having "some physical problems, more pain than usual." Tr. 226. Johnson estimated that three to four times a year Balachowski has "minor bouts of depression" which last about a week or two. Tr. 226-227. When asked how Johnson thought Balachowski was coping at the time of the hearing, Johnson responded: "[S]he's holding up pretty good right now. Because she can talk about other things than just what's going on right now with the building, with Mr. Boidy and with the Court." Tr. 227. Johnson concluded that a "culmination of many things," including the difficulties with her apartment contributed to Balachowski's bouts of depression. Tr. 230.

## DISCUSSION

The district court's standard of review as to a recommendation made by a magistrate judge is defined by 28 U.S.C. § 636(b)(1). Section 636(b)(1)(C) requires that, for dispositive motions, the district court judge must "make a de novo determination of those portions of the [magistrate judge's]...recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). "A district judge may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." *Id.* Efficiency in judicial administration requires that all arguments be presented to the magistrate judge in the first instance. *Anna Ready Mix, Inc. v.*

20

*N. E. Pierson Construct. Co.,* 747 F. Supp. 1299, 1302-03 (S.D. Ill. 1990). The review procedure

thus does not afford the opportunity to present new arguments not raised before the magistrate

judge. *Id.* at 1303. (S.D.Ill. 1990). It is with these principles in mind that we review the

objections before us. The parties raise objections to Magistrate Nolan's proposed award of

damages only.

## I. Compensatory Damages

  Both parties object to Magistrate Nolan's proposed award of compensatory damages.

Magistrate Nolan recommended that $25,250 be awarded in compensatory damages, $25,000 of

which was specifically awarded to cover the emotional distress Balachowski suffered. Plaintiff

argues that the award of $25,000 is grossly disproportionate to the emotional distress suffered by

Balachowski, especially in light of the fact that she was subjected to this emotional distress over

a six year period. Balachowski argues that Boidy was put on notice that his actions were illegal

and his failure to correct the violations magnified the injury to Balachowski. Defendant, on the

other hand, claims that the compensatory damages recommended by the Magistrate are excessive

because Balachowski's emotional distress is not supported by the evidence in the record   Boidy

argues that Balachowski has offered no evidence to sort out her environmental depression from

any emotional distress which may have been caused by the Fair Housing–Handicap Access

violations, and that no evidence was offered to differentiate the impact of the Fair Housing

violations from the pain and frustration caused by the handicap itself. Defendant further argues

that the Fair Housing-Handicap Access violations did not seriously aggravate Balachowski's

condition in that when Balachowski was offered a chance to move into affordable Section 8

housing elsewhere she declined to move.

The Seventh Circuit has long held that emotional distress caused by housing discrimination is a compensable injury under the Fair Housing Act. *United States v. Balistrieri,* 981 F. 2d 916, 931 (7th Cir. 1992) citing *Seaton v. Sky Realty Co.,* 491 F. 2d 634, 636-38 (7th Cir. 1974). However, a compensatory damage award "must bear a reasonable relation to actual injury sustained" and "may not be punitive in nature." In housing discrimination cases, we have generally upheld awards for emotional distress despite the lack of detailed description of that distress. *Douglas v. Metro Rental Services, Inc.,* 827 F. 2d 252, 256-57 (7th Cir. 1987) and *Crumble v. Blumthal,* 549 F. 2d 462, 467 (7th Cir. 1977). One factor to be considered in determining whether to set aside an award of damages is whether the award is out of line with awards in similar cases. *Levka v. City of Chicago,* 748 F. 2d 421 (7th Cir. 1984). The court is fully aware that "the assessment of damage, especially for intangible harms such as humiliation and distress, is inescapably judgmental and subjective to a large degree, and to that degree therefore discretionary..." *Hunter v. Allis Chalmers Corp.,* 797 F. 2d 1417, 1425 (7th Cir. 1986).

In *Phillips v. Hunter Trails Community Ass'n,* 685 F. 2d 184 (7th Cir. 1982), a black businessman and his wife had each been awarded $25,000 in compensatory damages for humiliation and embarrassment they suffered as victims of housing discrimination. The Seventh Circuit reduced the award in compensatory damages to $10,000 noting that damages for intangible injuries to victims in housing discrimination cases usually range between $500.00 and $5,000.00 *Id.* at 190. The court upheld that trial court's award of $50,000 in punitive damages for each of the plaintiffs. In *Douglas v. Metro Rental Servs.,* 827 F. 2d 252 (7th Cir. 1987), the Seventh Circuit reduced a plaintiff's $40,000 award for compensatory damages to $10,000. However, the Seventh Circuit affirmed $50,000 in compensatory damages in *Littlefield v.*

22

*McGuffy*, 954 F. 2d 1337 (7th Cir. 1992). In *Littlefield*, the plaintiff was subjected to "the most venomous and loathsome of racist epithets," and a death threat had been taped to her door. *Id.* at 1348.

In the present case the compensatory damages recommended by Magistrate Nolan were comprised of plaintiff's monetary loss and emotional distress. According to the testimony, plaintiff's monetary loss was $250.00 for certain changes to the apartment to make it more accessible including reversing the refrigerator and freezer doors, installing a hand held shower, purchasing power strips, taking down the bathroom door and purchasing reachers for the light switches and the thermostat. This amount is not in dispute and $250.00 is reasonable in light of the work performed and the items purchased.

Disputed, however, is the amount recommended for Balachowski's emotional distress. From the excerpts of the report and recommendation we glean the following: At the hearing plaintiff Balachowski testified that she began seeing a therapist at Proviso Township Family Services in 1993 for depression. Tr. 160-161. She was diagnosed with environmental depression. Tr. 192. Balachowski saw a therapist once a week for 1993-until sometime in 1994. Tr. 161. Balachowski then saw a different therapist once a week for the next year to year and a half. Balachowski gave conflicting testimony concerning whether she had taken any medications for her depression. Tr. 192, 193. For five years Ms. Balachowski had to lift a damaged door to close it. On October 3, 1995 another resident damaged Ms. Balachowski's door. Tr. 65, 66. Mr. Boidy, although aware of the damage never repaired the door. For a month and a half Ms. Balachowski used a sock as doorknob. Tr. 145-146. On one occasion when not in her wheelchair, Balachowski fell off the rear entrance ramp while attempting to open the rear door

23

from the outside. Tr. 49, 50-51. On numerous occasions, Balachowski has fallen off the rear

ramp while in her wheelchair when persons have opened the door from the inside. Tr. 50.

Balachowski felt agitated and frustrated every time her chair wheel caught in a sewer hole which

a drainage cap which was smaller than the opening. Tr. 56. Balachowski also experienced fear in

that the peephole in her door was too high to use while in a wheelchair. Tr. 61. Balachowski had

a heightened concern about her safety and security having been a victim of rape. Tr. 64. Thus, it

is clear that Balachowski introduced a good deal of evidence relating to the mental distress and

humiliation she suffered because of Boidy's non-compliance actions. Balachowski explained

that Boidy's actions made her feel "[a]gitated, depressed, like a piece of garbage, not even human

anymore. About this time I started thinking about killing myself. At least that way I wouldn't

have to put up with–these type of things I had to put up with." (Tr. 152).

Alberta Johnson a neighbor of Balachowski's also testified in support of Balachowski's

request for intangible damages. Johnson observed Balachowski crying sometimes because of the

difficulties Balachowski encountered in the Building. Tr. 225. Johnson stated the following

regarding how the accessibility difficulties affected Balachowski: "[T]hey wear her-they wear her

a lot more than they used to. Tr. 225. Johnson testified that a "culmination of many things,"

including the difficulties with her apartment contributed to Balachowski's bouts of depression.

Tr. 230.

Balachowski's testimony about her emotional feelings and fear of the lack of sufficient

security supports an award for Balachowski's claims of intentional infliction of emotional

distress and we find that Magistrate Nolan's recommendation of $25,000 in damages

Balachowski suffered is warranted. Balachowski's emotional state clearly was affected by the

difficulties she encountered as a result of the accessability violations and there is a connection between the award and the evidence presented. A rational jury could have determined from Balachowski's testimony that she suffered as a result of Boidy's failure to bring her apartment and the building itself into handicap accessible compliance.

In attempting to persuade us that the compensatory damage award is excessive, Boidy cites *Avita v. Metropolitan Club of Chicago, Inc.,* 49 F. 3d 1219 (7th Cir. 1995), a case in which a $21,000 compensatory damage award was reduced to $10,500. However, in *Avita,* the plaintiff brought his case under the Fair Labor Standards Act and based his claim of damages on the fact that he suffered emotional distress from a wrongful discharge from his job. *Avita,* 49 F. 3d at 1228-29. In contrast to *Avita,* Balachowski was subjected to emotional distress in the day to day living in her apartment.

Although Balachowski's injuries are compensable, her damages must be limited. Balachowski relies on *Broome v. Bondi,* 17 F. Supp. 2d 211 (S.D.N.Y., 1997) where the court awarded $228,000 for the emotional distress on a discrimination claim under the Fair Housing Act, 42 U.S.C. § 1981 to support her request for $250,000.00. *Broome* is distinguishable in that intentional race discrimination was established against the co-op's board of directors for their racially motivated exclusion of plaintiffs. *Id.* Balachowski continues to live in her apartment and the request of $250,000 in compensatory damages would not be appropriate under the circumstances of this case. Balachowski's testimony does not establish that she suffered such severe distress which would warrant the amount of damages requested. Balachowski failed to present evidence explaining her diagnosis of environmental depression and no evidence in the record indicates that Balachowski was so distressed that ordinary actitivites that she participated

in were affected. Lastly, the $25,000.00 award is not out of line with other similar awards. In *Webb v. City of Chester, Ill.*, 813 F. 2d 824 (7th Cir. 1987), the Seventh Circuit approved an award that included $20,250 as compensation specifically for embarrassment and humiliation where a police officer successfully asserted al claim of sexually discriminatory discharge. Here the Seventh circuit noted awards that had passed appellate review to range from a "a low of $500 to a high of over $50,000." *Id.* at 837. In *Krueger v. Cuomo,* 115 F. 3d 487, 492 (7th Cir. 1997) the Seventh Circuit affirmed an award of $20,000 for the emotional distress suffered by a young mother after her landlord sexualy harassed her and attempted to have her evicted because she rejected his advances and filed a sexual harassment complaint against him. More recently, in *Johnson v. Kakvand,* 192 F. 3d 656, 662 (7th Cir. 1999) an award of $5,000 for emotional distress was upheld despite plaintiff's argument that $20,000 was the appropriate amount and in *Baltmore Neighborhoods, Inc v. Lob, Inc.* 92 F. Supp 2d 465, 463 (D.M.D. 2000) $1.00 despite plaintiff's request for $34,000. We therefore decline to modify the recommended compensatory damages award in this case, and both parties objections as to this $25,000 are overruled.

## II. Punitive Damages

Plaintiff also objects to the punitive damages awarded in the Report and Recommendation. Plaintiff claims that the $5,000 punitive damage award is insufficient because Boidy's statements regarding his "financial difficulties" were self-serving and were never raised earlier. Plaintiff contends that Boidy acted willfully and wantonly when he failed to make the many repairs required to fix plaintiff's apartment and that Boidy made numerous misrepresentations to the Court when he failed to make all the modifications listed in the expert's report and had no intention of doing so.

Punitive damages are appropriate in certain cases "to punish a wrongdoer for outrageous conduct and to deter others from engaging in similar conduct." *Hennessy v. Penril Datacomm Networks, Inc.,* 69 F. 3d 1344, 1352 (7th Cir. 1995). An award of punitive damages, however, must be supported by the record; it "may not constitute a windfall to the prevailing party."*Id., citing Ramsey v. American Air Filter Co.,* 772 F. 2d 1303, 1314 (7th Cir. 1985)(other citations omitted). The evidence adduced at the prove up hearing support the award of $5,000 in punitive damages based upon Boidy's failure to construct ramps at the rear and front entrance complying with the Act despite having a copy of Robb's first report. This act alone showed that Boidy acted with total reckless indifference to Balachowski's rights. Balachowski argues that punitive damages should exceed those recommended in the Report and Recommendation because the Report and Recommendation found that Boidy's failure to follow through on his promises to the Court to make certain modifications were the result of "financial difficulties" without addressing the hundreds of thousands of dollars of income his companies were enjoying. Balachowski argues that Boidy's statements as to his financial difficulties were self serving and that other numerous intentional acts took place when Boidy failed to fix the intercom system, failed to fix the door to Balachowski's apartment, failed to raise the electrical outlets, failed to correct the bathroom, failed to lower environmental controls, and failed to make the laundry room accessible to wheelchair users. Balachowski points out that on two separate occasions, Boidy told the Court he would fix the accessibility of the building but failed to do so. Magistrate Nolan concluded that the above acts were not motivated by ill will, malice, or a desire to injure a disabled person but rather were the result of severe financial difficulties. Magistrate Nolan noted that Balachowski failed to present any evidence contradicting Boidy's account of his financial

situation during the relevant time period.

The evidence at the hearing shows that Boidy did not act with total reckless indifference to Balachowski's rights. With regard to Boidy's financial situation, it was conclusively established that Boidy's financial difficulties resulted in him being unable to keep up with the mortgage payments on his building and his home, the water being turned off at the building, and the electricity and gas being turned off at his home. Tr. 248. It is undisputed on March 18, 1997, First Bank filed a foreclosure on the building along with nine additional buildings belonging to Boidy. Uncontested Fact ¶ 11. On April 4, 1997, a receiver was appointed for all of the First Bank properties, including the building. Uncontested Fact ¶ 12. On August 6, 1997, Boidy filed for protection under Chapter 11 of the Bankruptcy Code. Uncontested Fact ¶ 13. Boidy lost five buildings through the foreclosure. Tr. 249. Boidy's bankruptcy case was dismissed on December 17, 1997. Uncontested Fact ¶ 14. As part of the settlement, Boidy turned over the building and twelve other properties to First Bank. Uncontested Fact ¶ 14.

Balachowski argues that Boidy statements as to his financial difficulties were self-serving in that Colonial Investments and Cassidy Builders were paid $773,000 for various projects but this fact even accepted as true does not render Boidy's statements to be self-serving or not supported by the evidence. The fact that Boidy suffered severe financial difficulties is undisputed. Obviously, Boidy's expenses and liabilities were much greater than the income his company was generating or the substantial loss of five properties would not have taken place. To be sure, Boidy should have brought such difficulties to the attention of the Court earlier but his failure to do such does not support a finding of malice or reckless disregard. The conduct of Boidy, while indicating poor business judgment, is not severe enough to warrant a larger award

28

of punitive damages.

## III. Retrofitting

Boidy's final argument puts forth that he should not be required to retrofit the building after Balachowski accepted the building as is. Boidy argues that after Balachowski refused to move out of her apartment her right to relief for future damages ended. Moreover, Boidy points out that he is no longer owner of the building and should not be ordered to make changes in the building.

"In fashioning equitable relief for the violation of the Fair Housing Act, trial courts ... are guided by its underlying purposes." *Smith v. Clarkton,* 682 F. 2d 1055, 1068 (4th Cir. 1982)(citations omitted). The declared purpose of the Fair Housing Act is "to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. The Fair Housing Amendments Act, which extended the protection of the federal fair housing laws to persons with disabilities, "is worded as a broad mandate to eliminate discrimination against and equalize housing opportunities for disabled individuals." *Bronk v. Ineichen,* 54 F. 3d 425, 428 (7th Cir. 1995). The accessibility provisions of the Fair Housing Amendments Act, which Boidy violated in this case, are essential to carrying out this mandate. As the legislative history makes clear:

> A person using a wheelchair is just as effectively excluded from the opportunity to live in a particular dwelling by the lack of access into a unit and by too narrow doorways as by a posted sign saying "No Handicapped People Allowed."

H.R. Rep. No. 711 at 25, reprinted in U.S.C.A.N. at 2186.

To this end, courts have generously construed the language of the Fair Housing Act to ensure the prompt and effective elimination of housing discrimination. "Generally, and

particularly in a fair housing situation, the existence of a federal statutory right implies the existence of all measures necessary and appropriate to protect federal rights and implement federal policies." *Metro House. Dev. Corp. v. Arlington Heights,* 616 F. 2d 1006, 1011 (7th Cir. 1980)(citation omitted).

In a civil Fair Housing Act case brought by a private person, the court's equitable powers include the power to order such affirmative action as my be appropriate. 42 U.S.C. § 3613(c)(1). Affirmative injunctive relief for past discriminatory practices, such as the relief requested by plaintiffs, "is appropriate where the trial court believes that the vestiges of prior discrimination linger and remain to be eliminated." *United States v. DiMucci,* 879 F. 2d 1488, 1498 (7th Cir. 1989). (citations omitted)(internal quotations omitted).

Here, Boidy argues that plaintiff is not entitled to affirmative action relief in the form of a retrofitting fund because Boidy is no longer the owner of the property. However, the fact that Boidy is no longer the owner is irrelevant. The violations occurred while Boidy was the owner and could have been remedied then. They were not. The law of equity is served by having Boidy, the owner of the property at the time in question, set aside funds to have the violations remedied. In this case, the Court finds that retrofitting, or the establishment of a retrofitting fund, is an appropriate way to remove the physical barriers created by Boidy's discriminatory practices. The requested relief will benefit not only plaintiff but all other persons subject to the accessibility violations.

## CONCLUSION

For the reasons set forth above, we overrule the parties' objections and adopt Magistrate Judge Nolan's Report and Recommendation. Balachowski is awarded compensatory damages in the amount of $22,250.00 and punitive damages in the amount of $5,000.00. Boidy to establish a fund in the amount of $20,990.00 for future retrofitting of Balachowski's unit and certain of the public and common use areas. This is a final and appealable order.

**SO ORDERED**

ENTERED: *9/19/00*

HON. RONALD A. GUZMAN
United States Judge